Case 1:22-cv-00311-MJT   Document 103   Filed 03/09/26   Page 1 of 17 PageID #:
Case 4:23-mc-00008-Y   Document 1   Filed 06/06/23   Page 1 of 17   PageID 1
706

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**US TRINITY ENERGY SERVICES, LLC,**

      **Petitioner,**

v.                                                 **Civil Action No. _____**

**SOUTHEAST DIRECTIONAL
DRILLING, LLC,**

      **Respondent.**

_____/

**PETITION TO VACATE ARBITRATION AWARD AND NOTICE
OF APPLICATION FOR ORDER TO VACATE ARBITRATION AWARD**

Petitioner US Trinity Energy Services, LLC, by and through its attorneys, Cooper & Scully, P.C., files this Petition to Vacate Arbitration Award against Respondent Southeast Directional Drilling, LLC under 9 U.S.C. § 10 and Notice of Application to Vacate Arbitration Award.

## INTRODUCTION

1. Trinity requests vacatur of an arbitration award issued on March 6, 2023 and transmitted on March 8, 2023, in American Arbitration Association Case No. 01-21-0003-7337, *US Trinity Energy Services, LLC v. Southeast Directional Drilling, LLC*. A true and correct copy of the Final Award as transmitted is attached as **Exhibit A**. An arbitration panel entered an award of $1,662,000.00 against Trinity in Southeast's favor. The panel further ordered that Trinity pay Southeast $3,974.97 in administrative fees and expenses (*see* **Exhibit A** at 16). Trinity seeks a judgment from this Court vacating the Final Award.

Case 1:22-cv-00311-MJT   Document 103   Filed 03/09/26   Page 2 of 17 PageID #:
Case 4:23-mc-00008-Y   Document 1   Filed 06/06/23   Page 2 of 17   PageID 2
                                                     202

## PARTIES

2.   Trinity is a limited liability company organized under the laws of the State of Texas with its principal place of business in Denton County, Texas. Its sole member is a citizen of the State of Texas.

3.   Upon information and belief, Southeast is a limited liability company organized under the laws of the State of Arizona with its principal place of business in Casa Grande, Arizona. Under 9 U.S.C. § 9 and the Federal Rules of Civil Procedure, Southeast may be served with this Petition to Vacate Arbitration Award and Notice of Application for Order to Vacate Arbitration Award by serving its President, Todd Barton, at 3117 N. Cessna Ave., Casa Grande, AZ 85122.

## JURISDICTION AND VENUE

4.   This Court has jurisdiction to vacate the arbitration award under 28 U.S.C. § 1332 because complete diversity exists between the parties and the amount sought and awarded in the arbitration proceeding exceeds $75,000.

5.   This Court has personal jurisdiction over Southeast because Southeast purposefully availed itself of the laws of the State of Texas when it agreed by contract to hold the arbitration proceedings in Texas and consented to Fort Worth, Texas as the situs of the arbitration. Southeast has established minimum contacts with Texas and the exercise of jurisdiction by the courts of this state comports with traditional notions of fair play and substantial justice.

6.   Venue is proper for this proceeding under 9 U.S.C. § 9 because the Final Award was issued by an arbitration panel in Fort Worth, Texas.

Case 1:22-cv-00311-MJT   Document 103   Filed 03/09/26   Page 3 of 17 PageID #:
Case 4:23-mc-00008-Y   Document 1   Filed 06/06/23   Page 3 of 17   PageID 3
702

# FACTUAL BACKGROUND

7. Trinity filed a Demand for Arbitration with the American Arbitration Association against Southeast, seeking a declaration it was not required to pay Southeast's claimed standby costs. A true and correct copy of Trinity's Demand for Arbitration is attached as **Exhibit B**. The controversy arose out of a subcontract between Trinity and Southeast in which Southeast agreed to perform horizontal drilling work for a pipeline project in Pennsylvania—the Sunoco Mariner East Phase II pipeline project. A true and correct copy of the subcontract is attached as **Exhibit C**. While the project was ongoing, Southeast made claims for "standby" costs when the project owner—Sunoco—(i) was unprepared to proceed because it failed to timely obtain permits for the work; (ii) encountered work disruptions because of the COVID-19 pandemic; and (iii) ordered work to stop when Southeast experienced "inadvertent returns" while drilling. Although Trinity passed all standby claims through to Sunoco, Sunoco refused to pay them. When Southeast looked to Trinity for payment, Trinity also declined based on several provisions of the subcontract and Southeast's waiver of the claims under a Direct Payment Agreement it entered with Sunoco.

8. The subcontract afforded the parties the option of litigation or arbitration for "all claims, disputes, and controversies arising out of or relating to [the subcontract]…." (*see* **Exhibit C** at 18 (¶9.01)). If the parties chose to arbitrate, any arbitrations were to be conducted under the rules of the American Arbitration Association's Construction Industry Arbitration Rules (**Exhibit C** at 18 (¶9.01(a)).

Case 1:22-cv-00311-MJT   Document 103   Filed 03/09/26   Page 4 of 17 PageID #:
Case 4:23-mc-00008-Y   Document 1   Filed 06/06/23   Page 4 of 17   PageID 4
                                    702

The subcontract designated Fort Worth, Texas as the location of the arbitration (**Exhibit C** at 18 (¶9.01(a)).

9. In response to Trinity's demand for arbitration, Southeast filed an answering statement and counterclaim, asserting that Trinity was responsible for payment of all standby claims, totaling over $1.7 million. A true and correct copy of Trinity's Joinder/Consolidation Request, with Southeast's counterclaim is attached as **Exhibit D**. Both parties also sought their respective attorneys' fees as authorized by the subcontract. Neither party has challenged the arbitrability of any issue in this dispute, nor has either party challenged the jurisdiction of the arbitration panel.

10. The subcontract provides that the American Arbitration Association shall administer arbitrations (**Exhibit C** at 18 (¶9.01(a)). Three arbitrators were appointed as the panel for this dispute—Theodore A. Adler, Esq., R. Carson Fisk, Esq., and Neal M. Eiseman, Esq. Neither party has objected to the selection of any of the arbitrators.

11. No evidentiary hearings were held; the dispute was submitted to the panel based on documents exchanged by the parties, the deposition testimony of two witnesses—Grant Stein for Trinity and Todd Barton for Southeast—and the parties' briefing.

12. Following submission of the parties' opening and responsive briefs, the panel issued a Final Award on March 6, 2023, which was transmitted on March 8, 2023 (**Exhibit A**).

Case 1:22-cv-00311-MJT     Document 103     Filed 03/09/26     Page 5 of 17 PageID #:
Case 4:23-mc-00008-Y     Document 1     Filed 06/06/23     Page 5 of 17     PageID 5
                                          210

13. In the Final Award the panel found that two paragraphs of the multi-page agreement were "stand alone" provisions, not subject to the subcontract's contingent payment language or any other exclusion. According to the panel, the "terms regarding payment for standby time in the subcontract…were unconditional and therefore more favorable to [Southeast]" and Southeast was therefore entitled to $1,662,000 on its standby claims (**Exhibit A** at 13, 15).

14. The panel also (i) awarded Southeast $3,974.97 in administrative fees and expenses and (ii) denied attorneys' fees to both parties because paragraph 11.03 of the subcontract permitted only Trinity to obtain attorneys' fees if it was the prevailing party (**Exhibit A** at 16).

## MOTION TO VACATE ARBITRATION AWARD

15. The Federal Arbitration Act is applicable to all "commerce among the several States." 9 U.S.C. §§ 1, 2. The Trinity-Southeast subcontract is between a Texas corporation and an Arizona corporation regarding work performed in Pennsylvania. The subcontract also recites that judgment "may be entered upon the award in accordance with the Federal Arbitration Act." (**Exhibit C** at 18 (¶9.01(a)). The subcontract thus concerns commerce among multiple states and requires reliance on the FAA following a final award.

16. The issue in this case is whether the arbitration panel exceeded its authority because it disregarded not just numerous paragraphs of the subcontract, but also a Direct Payment Agreement in which Southeast was paid over $3 million "as payment in full settlement of all claims against [Sunoco] and the Liens" and

"waiv[ed] and releas[ed] any claim for additional payment against [Sunoco] or the Project relating to the Subcontract or the Project." (*see* **Exhibit E**—Subcontractor Direct Pay Agreement at ¶2) (emphasis added).

17. That Agreement further recited that the "payment made by [Sunoco] under this DPA is a one-time-only payment to [Southeast] for work and services performed under the Subcontract and <u>constitutes payment in full and final settlement of the Liens for work on the Project</u>" (**Exhibit E** at ¶4) (emphasis added). This Court should therefore vacate the award under 9 U.S.C. § 10(a)(4) as exceeding the panel's power. Upon vacatur of the award, this matter should be returned to the arbitration panel to issue an award of attorneys' fees to Trinity as the prevailing party.

## UNDERLYING FACTS

Trinity contracted with Sunoco Pipeline, L.P. for Trinity to serve as the General Contractor for construction of 16" and 20" natural gas pipelines in Pennsylvania (**Exhibit F**—Prime Contract). That project—known as Sunoco Mariner East II—required drilling pipelines from western Pennsylvania to the Delaware River. Trinity hired Southeast as the drilling subcontractor.

Under the subcontract, Southeast was to perform four horizontal directional drills for a lump sum of $7,332,019 (**Exhibit B** at ¶4.01). Standby costs—incurred by having machinery and workers at the drilling sites but not working—were extra charges, subject to a change order process (**Exhibit G**—deposition testimony of Southeast president Todd Barton, Vol. 1—at 16:24-17:5).

Case 1:22-cv-00311-MJT     Document 103     Filed 03/09/26     Page 7 of 17 PageID #:
Case 4:23-mc-00008-Y     Document 1     Filed 06/06/23     Page 7 of 17     PageID 7
                                                  712

Several subcontract provisions limited Trinity's liability to Southeast for standby and other payments:

- Paragraph 3.06 vitiated Trinity's responsibility for paying Southeast's costs for "disruptions, hindrances, acceleration of, or interruptions" if caused by Sunoco.

- Paragraph 3.06 further abrogated Trinity's responsibility for payment of standby costs associated with force majeure events.

- In ¶5.03 Southeast agreed that Sunoco's decisions about additional compensation were final, and Southeast expressly waived its right to standby payments if Sunoco denied them.

- And ¶5.04 recited that Southeast's exclusive remedy for nonpayment of standby costs was a pass-through claim against Sunoco.

### A. Sunoco's failure to obtain proper permits results in delays to Southeast's work.

The parties agreed that it was Sunoco's responsibility, as project owner, to obtain all permits, including the drilling permits (**Exhibit H**—deposition testimony of Trinity representative Grant Stein, at 118:20-25; **Exhibit G** at 35:12-36:5, 53:13-54:12). Although Sunoco directed Trinity to mobilize Southeast's drilling equipment, by the time it was ready a week later Sunoco still had not obtained required permits for two locations (**Exhibit F** at 35:9-11; **Exhibit I**—2/20/2020 email from Trinity re permit delays/standby). Trinity had no role in obtaining permits and Southeast acknowledges permitting issues were not Trinity's fault (**Exhibit H** at 119:1-3, **Exhibit G** at 63:6-12).

Southeast told Trinity standby charges would start accruing because of the permitting delays, and Trinity sent those messages to Sunoco (**Exhibit J**). Later, Southeast sent standby invoices to Trinity, and they were likewise submitted to Sunoco (**Exhibit K**).

### B. More delays with resulting standby charges, none of which were Trinity's fault: the COVID-19 pandemic and "inadvertent returns."

Twice during their drilling Southeast experienced conditions known as "loss of circulation" or "inadvertent returns." These are common during drilling operations, occurring when the mud being drilled is not stable enough and migrates to the surface (**Exhibit G** at 39:1-12). They can be caused by a number of things—drill design, underground fault, or user error (**Exhibit H** at 119:9-20). None, however, were caused by Trinity (**Exhibit G** at 41:13-23). In fact, because these are common occurrences there should not have been any delay at all—but in an unusual move, Sunoco directed Southeast to stop drilling and "grout" the hole (**Exhibit G** at 44:12-46:6, 70:25-71:12; **Exhibit H** at 119:4-120:1).

Then, while the project was actively proceeding, Sunoco directed Trinity to stop all drilling based on the Pennsylvania Governor's Executive Order to halt all non-essential work because of the COVID-19 pandemic (**Exhibit L**—March 20, 2020 Sunoco Notice of Force Majeure Event). Again, it was Sunoco that directed which drilling operations were shut down and which went forward, and Sunoco changed its mind several times about shutting down work entirely, partially proceeding, and seeking waivers from the Governor's Executive Order (**Exhibit G** at 79:4-10; **Exhibit H** at 120:2-16, 120:24-121:10).

Case 1:22-cv-00311-MJT   Document 103   Filed 03/09/26   Page 9 of 17 PageID #:
Case 4:23-mc-00008-Y   Document 1   Filed 06/06/23   Page 9 of 17   PageID 9
                                          214

### C. Trinity submits all standby claims to Sunoco. Sunoco never pays them and then negotiates a Direct Pay Agreement with Southeast in which Southeast waives its right to recover standby costs.

Trinity was proactive about notifying Sunoco about potential standby claims and submitting those claims to Sunoco; as soon as Trinity knew Southeast would make a claim Sunoco was advised (**Exhibit H** at 57:22-59:16). But Trinity also told Southeast it would only be paid if Sunoco paid (*Id.* at 61:8-15; **Exhibit M**—April 6, 2020 email from Trinity to Southeast re standby claims will be paid to the extent Trinity is paid by the owner). Sunoco never paid the standby charges (**Exhibit H** at 80:16-22), and Southeast later waived the right to be compensated for those claims when it entered into a Direct Payment Agreement with Sunoco (*Id.* at 82:10-84:19).

In the Direct Pay Agreement, Southeast "expressly waive[d] and release[d] any claim for additional payment against [Sunoco] or the Project relating to the Subcontract or the Project." (**Exhibit E** at ¶2). True, it also recited that Southeast was not waiving any rights to claim additional payments from Trinity (**Exhibit E** at ¶5). But by forfeiting its right to make standby claims against Sunoco, Southeast violated ¶5.04 of the subcontract, relinquishing its "sole and exclusive remedy against [Trinity]" of pursuing a pass-through claim against Sunoco (**Exhibit C** at ¶5.04).

And months earlier, Southeast executed an Interim Release of Liens and Claims in Sunoco's favor where it "waive[d] and release[d] <u>all</u> rights…to assert claims of <u>any</u> kind, including…those arising from the Subcontract…"(**Exhibit N**— Subcontractor's Interim Release of Liens and Claims—at ¶ i). Indeed, in exchange

Case 1:22-cv-00311-MJT    Document 103    Filed 03/09/26    Page 10 of 17 PageID #:
Case 4:23-mc-00008-Y     Document 1     Filed 06/06/23    Page 10 of 17    PageID 10
                                            2165

for more than $4 million, Southeast agreed it "received full payment…for all work performed and labor, materials, and equipment supplied in connection with the Project…" and there were no outstanding claims for any work on the Project, other than what was contained in any attached change orders (*Id.* at ¶ ii(i), ii(ii)). Southeast attached no change orders to the release.

### D. Trinity settles its claims with Sunoco and later demands arbitration to resolve its claims with Southeast.

About a month after Southeast executed the Direct Pay Agreement, Trinity settled its own claims with Sunoco (**Exhibit O**—Sunoco-Trinity Settlement and Release Agreement). Because Sunoco continued to deny Southeast's standby claims, and because Southeast eviscerated its chances of recovering its standby costs via its agreement to forego any further claims against Sunoco, Trinity and Sunoco agreed that none of the payments to Trinity were for Southeast's standby costs (**Exhibit O** at ¶3).

Approximately a month after Trinity settled with Sunoco, it brought an arbitration proceeding against Southeast, seeking a declaration it was not responsible for Southeast's standby costs (**Exhibit B**). Southeast counterclaimed, saying Trinity was responsible for over $1.7 million in standby costs, and Trinity consolidated the proceedings (**Exhibit D**). The parties agreed to submit their claims to the arbitration panel based on briefing alone (*see* **Exhibit P**—Trinity's opening brief; **Exhibit Q**—Southeast's opening brief; **Exhibit R**—Trinity's reply brief; and **Exhibit S**—Southeast's reply brief). The panel issued its final award on March 6, 2023, and it was transmitted to the parties two days later (**Exhibit A**).

Case 1:22-cv-00311-MJT   Document 103   Filed 03/09/26   Page 11 of 17 PageID #:
Case 4:23-mc-00008-Y   Document 1   Filed 06/06/23   Page 11 of 17   PageID 11
2116

## ARGUMENT

### THE ARBITRATION PANEL EXCEEDED ITS AUTHORITY BY FAILING TO GIVE EFFECT TO THE COMPLETE SUBCONTRACT AND IGNORING EVIDENCE THAT SOUTHEAST HAD WAIVED ITS CLAIMS FOR STANDBY COSTS.

An arbitration panel's award "may be vacated where the arbitrators exceeded their powers." *Totem Marine Tug & Barge, Inc. v. North American Towing, Inc.*, 607 F.2d 649, 651 (5th Cir. 1979). Because contracts must be read as a whole, "to ascertain and give effect to the intent of the parties as that intent is expressed in the contract," and because the panel here ignored numerous contract provisions relieving Trinity of liability for Southeast's standby costs, the March 6, 2023 award should be vacated. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); *see also Five Star Royalty Partners Limited v. Mauldin*, 973 F.3d 367, 372 (5th Cir. 2020) (single contract provisions should not be given effect above others; "all the provisions must be considered with reference to the whole instrument").

### A. Reading the Trinity-Southeast subcontract in its entirety could only have resulted in one conclusion: Southeast accepted the risk that it might not be paid for standby costs.

In awarding Southeast in excess of $1.6 million for its claimed standby costs, the arbitration panel relied on only two of several important provisions of the subcontract. The panel determined ¶3.07 of the main agreement and paragraph 18 of Southeast's Bid Proposal—which was incorporated into the subcontract— controlled above all else. Paragraph 3.07 provided that Southeast would be entitled

to standby costs if work was suspended and not Southeast's fault (**Exhibit C** at 5). Paragraph 18 was virtually identical (*id.* at Bates No. SEDD-Prod_UST0006267). As far as the panel was concerned, those two provisions told the whole story.

Not so.

The following provisions limited or extinguished Southeast's claims, or made them contingent on other factors:

- ¶3.06—first, this provision eliminated Trinity's liability to Southeast for delays caused by Sunoco—and Southeast agreed all delays were caused by Sunoco (**Exhibit G** at 97:7-17; **Exhibit H** at 118:3-19). It was also a force majeure clause, which eliminated Trinity's liability for delays caused by natural disasters. This should have included delays caused by shutdown orders for the COVID-19 pandemic. *See JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 28 F.4th 118, 123-24 (2d Cir. 2022) (holding that the "COVID-19 pandemic…restricted how nonessential businesses could conduct their affairs [and]…constituted 'circumstances beyond our or your reasonable control,'" constituting a force majeure).

- ¶5.03—Southeast agreed that "notwithstanding anything contained [in the subcontract] to the contrary," Sunoco's decision about any claims for extra compensation were final. And if Sunoco denied those claims Southeast "waives its right to extra compensation from [Trinity] for such work and releases [Trinity] for any liability of payment

Case 1:22-cv-00311-MJT   Document 103   Filed 03/09/26   Page 13 of 17 PageID #:
Case 4:23-mc-00008-Y   Document 1   Filed 06/06/23   Page 13 of 17   PageID 13
F2168

therefor[]." Whatever else was written in the subcontract, Southeast agreed Sunoco's decision was final—and released Trinity from liability for those payments. *See El Paso Field Services, LP v. MasTec North America, Inc.*, 398 S.W.3d 802, 807-08 (Tex. 2013) (general contractor assumed risk contained in "notwithstanding" clause); *see also D2 Excavating, Incorporated v. Thompson Thrift Construction, Incorporated*, 973 F.3d 430, 434-35 (5th Cir. 2020) (contractor assumed risk project would require more work than expected).

- ¶5.04—Southeast agreed that its <u>exclusive</u> remedy against Trinity if it expected additional compensation was to assert a pass-through claim against Sunoco via Trinity.

- ¶5.04(b)—but even before Trinity had an obligation to assert a pass-through claim for Southeast, Southeast was required to "fully assert its own pass-through claim and cooperate with Trinity in asserting [it]…." But instead of asserting its own claim against Sunoco, Southeast signed the Direct Payment Agreement, agreed none of the payments it received were for standby costs, and then waived its right to make any other claims against Sunoco (**Exhibit E**).

Texas law required that the panel give effect to the entire agreement—not just part of it. *Seagull Energy*, 207 S.W.3d at 345; *Five Star Royalty Partners*, 973 F.3d at 372. The panel's failure to give effect to any of these additional provisions

limiting and eliminating Trinity's liability for standby costs therefore exceeded its authority.

### B. Signing the Direct Payment Agreement extinguished Southeast's right to payment for its standby costs.

The panel also exceeded its authority by ignoring the effect of the Direct Pay Agreement's broad waiver and release language and failing to recognize how the interplay between it and the subcontract further limited Southeast's right to standby costs.

In March 2021, Southeast, frustrated with what it believed was "radio silence" about being paid for its work on the project, negotiated a Direct Pay Agreement with Sunoco (**Exhibit G**, Vol. 2 at 119:9-19). In exchange for more than $3 million, Southeast "waive[d] and release[d] any claim for additional payment against [Sunoco]…relating to the Subcontract or the Project" (**Exhibit E** at ¶2). Southeast further "waive[d] and release[d] all rights it ha[d] to assert claims of any kind, including, without limitation, those arising from…other lien rights, against [Sunoco]…with respect to work performed" (**Exhibit E**—subcontractor's release of liens and claims at ¶1).

True, the Agreement also purported to reserve Southeast's right to make a claim against Trinity for other amounts due (**Exhibit E** at ¶5). But the subcontract recited that if Sunoco denied standby payments Southeast's "sole and exclusive remedy" against Trinity for those costs was a pass-through claim against Sunoco (**Exhibit C** at ¶5.04). So, by "waiv[ing] and releas[ing] all rights…to assert claims of any kind…against [Sunoco]," Southeast forever forfeited its right to standby

Case 1:22-cv-00311-MJT   Document 103   Filed 03/09/26   Page 15 of 17 PageID #:
Case 4:23-mc-00008-Y   Document 1   Filed 06/06/23   Page 15 of 17   PageID 15
                                    1320

payments. This is true irrespective of its purported reservation of rights against Trinity because Southeast's exclusive remedy was against Sunoco.

How do we know Southeast's claim for standby payment was against Sunoco only, and forever waived when it executed the Direct Payment Agreement? Because ¶5.03 of the subcontract says so: "If the work for which [Southeast] claims extra compensation…is determined by [Sunoco]…to be such that [Trinity] is not entitled to additional compensation…then [Southeast] waives its right to extra compensation from [Trinity]…and releases [Trinity] for any liability of payment therefor[]."

This case is similar to *D2 Excavating*. There, an excavation subcontractor—D2—sued a general contractor—Thompson—for additional payments when a construction site excavation required more work than anticipated. D2 agreed to do the work for a lump sum, but never investigated the site to determine the amount of work involved. Thompson represented that the site was balanced and therefore required less work, resulting in a lower subcontract price. But when D2 began excavating it realized the site was unbalanced and more work was required. When Thompson refused to pay D2's costs for additional work, D2 sued Thompson and was awarded more than $250,000 for excess work.

Vacating the award, the Fifth Circuit first recited the Texas default rule—that "the party doing the work bears the risk that it will end up being more difficult than anticipated unless the contract shifts that risk to the buyer of the services." *D2 Excavating*, 973 F.3d at 434, *citing Lonergan v. San Antonio Loan & Tr. Co.*, 101

Tex. 63, 104 S.W. 1061, 1065-66 (1907). Here, the Trinity-Southeast subcontract did not shift the risk for payment of standby costs to Trinity. In fact, it did the opposite. Southeast's entitlement to standby costs was predicated on first prosecuting a pass-through claim against Sunoco, a right Southeast gave up when it signed the Direct Payment Agreement.

Again, this is similar to the facts of *D2*: D2 knew it had an obligation to do a site assessment to determine how much excavation would be necessary. It ultimately "gave up" doing one because Thompson wanted to move the project forward. Here, Southeast knew (i) Sunoco's decision about extra compensation was final and (ii) if Sunoco denied extra compensation Southeast's sole remedy was a pass-through claim. But it gave up asking Trinity for help getting those payments and instead negotiated a deal with Sunoco directly—a deal that waived Southeast's right and obligation to make the pass-through claim. Despite Southeast's unequivocal waiver and the lack of a risk-shifting provision, the panel exceeded its authority and found Trinity liable for Southeast's standby costs. The award should therefore be vacated.

## CONCLUSION

By failing to give effect to and recognize the relationship between several provisions of the Trinity-Southeast subcontract, the arbitration panel exceeded its authority in contravention of Texas law. *Seagull Energy*, 207 S.W.3d at 345; *Five Star Royalty*, 973 F.3d at 372. The same is true of Southeast's relinquishment of its rights in the Direct Pay Agreement. Despite both Texas and Fifth Circuit law

requiring a finding in Trinity's favor, the panel exceeded its authority in awarding Southeast over $1.6 million. *El Paso Field Services, LP*, 398 S.W.3d at 807-08; *D2 Excavating, Incorporated*, 973 F.3d at 434-35. This Court should vacate the award and return this matter to the arbitration panel for an award of attorneys' fees to Trinity as the prevailing party.

Dated:  June 5, 2023                    Respectfully submitted,

/s/ R. Brent Cooper
R. Brent Cooper
TX Bar No. 04783250
Michelle E. Robberson
TX Bar No. 16982900
Stewart G. Milch
TX Bar No. 24108758
Cooper & Scully, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
(214) 712-9500
Brent.Cooper@cooperscully.com
Michelle.Robberson@cooperscully.com
Stewart.Milch@cooperscully.com

**ATTORNEYS FOR PETITIONER
US TRINITY ENERGY SERVICES, LLC**